USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/14/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RASHIDA WINFREY,

Plaintiff,

-against-

JPMORGAN CHASE BANK, NA,

Defendant.

25-CV-08310 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

This is an employment discrimination lawsuit. Plaintiff is Rashida Winfrey. Defendant is her former employer JPMorgan Chase Bank, NA ("JPMC"). Before the Court is JPMC's motion to transfer venue to the United States District Court for the Northern District of Georgia, in Atlanta. For the reasons set forth below, the motion is GRANTED.

## BACKGROUND

### I. RELEVANT FACTS[1]

Plaintiff is an African American woman who worked at JPMC as a Senior Business Consultant for Minority Entrepreneurs..[2] Dkt. No. 1 ("Compl.") ¶ 24. At all relevant times, Plaintiff was a resident of Georgia and worked primarily in Atlanta, Georgia. *Id.* ¶¶ 13, 26. Plaintiff moved to Alabama sometime after filing this lawsuit. Dkt. No. 24 at 11. JPMC's headquarters are in New York, NY. Compl. ¶ 26.

[1] The following facts are taken from the Complaint and are assumed true solely for purposes of resolving JPMC's motion to transfer.

[2] Plaintiff's title was later changed to "Senior Business Consultant for Underserved Entrepreneurs." In approximately January 2023, it was changed to "Senior Business Consultant." Compl. at 5 n.1.

Plaintiff's claims arise out of myriad interactions with her co-workers and supervisors while employed at JPMC in Atlanta. Plaintiff joined JPMC in November 2020, as part of JPMC's commitment to racial equity in the wake of the deaths of George Floyd and Breonna Taylor. *Id.* ¶¶ 15, 22. Plaintiff contends that a primary factor in her hiring was her breadth of experience and unique perspective into the issues facing local communities in the Atlanta area. *Id.* ¶¶ 20–24. One of her responsibilities was to service a new $30 billion Racial Equity Commitment ("REC") by JPMC. *Id.* ¶ 22. Once hired, Plaintiff worked out of the Atlanta office but regularly traveled as part of her job responsibilities, including to New York City. *Id.* ¶ 26.

During her tenure, Plaintiff became frustrated by JPMC's perceived departure from its racial equity commitment and began voicing her concerns to her direct superiors, Sean Ramasaywak, Mikal Quarles, and Robert Hines. *Id.* ¶¶ 33, 49. The responses she received were dismissive or unresponsive. *Id.* ¶ 55. Mr. Ramasaywak, who was based in New York but supervised many of Plaintiff's activities in Georgia, characterized those minority business owners who questioned the REC as "radical." *Id.* ¶¶ 33, 56. Mr. Quarles, Plaintiff's direct supervisor, painted black clients as "unable to be helped." *Id.* ¶¶ 57, 175. Mr. Hines, the South Region Area Manager who consistently made routine visits to Atlanta, argued that the firm should never have made the $30 billion commitment in the first place. *Id.* ¶¶ 49, 58, 149. Plaintiff pushed back on these comments, explaining she did not wish to break the trust that she had been instrumental in fostering with the minority community in Atlanta. *Id.* ¶ 55. Plaintiff alleges it was these disagreements that led to discrimination and retaliation against her. *Id.* ¶¶ 3, 71.

Plaintiff also brings allegations regarding a long-tenured JPMC employee, Samuel Taylor. *Id.* ¶ 73. Mr. Taylor resides and works in Atlanta. *Id.* ¶ 150. Although they held the

same title, Plaintiff alleges Mr. Taylor treated her like a subordinate and subjected her to professional and personal abuse. *Id.* ¶ 74. Plaintiff outlines a particular incident, in October 2021, which led her to file an official complaint with human resources ("HR"). *Id.* ¶ 79. At an offsite work function in Texas with other JPMC employees from the Atlanta office, Plaintiff and an invited guest, former Dallas City Councilwoman Tiffini Young, were speaking after dinner. *Id.* ¶ 80. Plaintiff alleges that Mr. Taylor positioned himself in between them, introduced himself in an aggressive and flirtatious manner, and was then asked by Ms. Young to get out of her personal space. *Id.* ¶¶ 81–83. Mr. Taylor did not appreciate this rebuke and began shouting at Ms. Young, calling her a "bitch." *Id.* ¶ 84. Plaintiff and Ms. Young were both visibly upset by this confrontation. *Id.* ¶ 85. Mr. Quarles, Plaintiff's direct supervisor at the time, stepped in and asked Mr. Taylor to leave Plaintiff and Ms. Young alone. *Id.* Mr. Quarles later advised Plaintiff to "stay far away from [Mr. Taylor] as much as possible." *Id.* ¶ 89. Plaintiff alleges this advice was impossible, as Plaintiff and Mr. Taylor worked closely together on the same team. *Id.* ¶ 90. Similarly, in September 2021, another Atlanta-based Business Banking Area manager, Winston Campbell, also told Mr. Taylor to stop harassing Plaintiff. *Id.* ¶ 87. Due to JPMC's lack of perceived response to the situation, however, Plaintiff took FMLA leave until January 2022. *Id.* ¶ 94. When Plaintiff took this leave, she lived in Georgia.

When she returned from leave, she formally reported the October 2021 incident to HR along with other instances of Mr. Taylor's harassment toward her.[3] *Id.* ¶ 95. HR concluded the investigation by finding no evidence of harassment, while declining to interview Ms. Young about the October 2021 incident because she was not a JPMC employee. *Id.* ¶ 97.

---

[3] Plaintiff alleges numerous other instances of harassment by Mr. Taylor, namely, a long line of inappropriate comments he made to non-white, female employees. Compl. ¶¶ 92, 107–14, 136, 143, 149–53.

Plaintiff alleges that after filing this complaint her supervisors treated her differently by not assigning her to work on high-profile matters and pressuring others not to work with her. *Id.* ¶¶ 99–101. Managing Director Kevin Thomas purportedly admitted that Mr. Quarles told him that he was treating Plaintiff poorly because she had complained to HR about Mr. Taylor. *Id.* ¶ 104. Another female victim also complained about Mr. Taylor to Brigitte Killings, who was the regional Managing Director for Community and Business Development and oversaw the Atlanta area. *Id.* ¶ 153. Ms. Killings spoke to another supervisor and suggested that JPMC take action against Mr. Taylor, but no disciplinary actions followed. *Id.* ¶¶ 153–54.

During the same period, Plaintiff also alleges that she was the victim of similar harassment by a prominent JPMC client named Jay Bailey. *Id.* ¶ 162. Mr. Bailey was the President and CEO of the RICE Center, a JPMC-funded partner organization based in Atlanta. *Id.*; Dkt. No. 15 at 2. Plaintiff was JPMC's main point of contact with the RICE Center and alleges that from the outset of this professional relationship Mr. Bailey aggressively pursued her romantically. Compl. ¶ 163. Mr. Bailey also suggested to JPMC leaders that he and Plaintiff had previously been in a romantic relationship and that he hoped "she would have become his wife." *Id.* ¶ 164.

Mr. Bailey repeatedly sent Plaintiff sexually suggestive messages, which eventually led her to ask him to stop this behavior via email, in late February 2023. *Id.* ¶¶ 167–68. Plaintiff followed up on this correspondence by initiating a complaint to HR regarding Mr. Bailey's repeated harassment. *Id.* ¶ 172. Plaintiff alleges that HR acknowledged that Mr. Bailey sexually harassed her, but would not take corrective action.[4] *Id.*

---

[4] Plaintiff also alleges that Mr. Quarles, Mr. Thomas, and Mr. Ramasaywak (all members of JPMC leadership) each subjected Plaintiff to gender-based insults based on her appearance and status as a woman in a male-dominated industry. Compl. ¶¶ 173–76.

In April 2023, Mr. Taylor filed a complaint with HR based on Plaintiff's alleged disparaging comments made about him to Mr. Hines. *Id.* ¶ 188. Plaintiff complained to JPMC leadership that Mr. Taylor's report was plainly retaliatory. *Id.* ¶ 191. HR promised that leadership would address her complaints about the process when Mr. Hines and Vaughn Lucus, National Field Director for Underserved (Minority Entrepreneurs) Business Banking, visited Atlanta. *Id.* ¶¶ 129, 195. Plaintiff spoke to Mr. Lucus about the issue during the field visit in Atlanta, but received an unsatisfactory response. *Id.* ¶ 198. Plaintiff alleges that, instead of these issues being addressed, she was berated for her performance via defunct financial and sales metrics. *Id.* ¶ 200. Plaintiff again took FMLA leave in early May 2023. *Id.* ¶ 204. When Plaintiff took this leave, she lived in Georgia.

When she returned from leave in late July 2023, Plaintiff alleges she did not have access to the JPMC system or email server and was then ignored for two weeks even after repeated requests for access. *Id.* ¶ 208. Plaintiff alleges numerous instances where she perceived actions taken by JPMC leadership in the wake of her return as "clearly punitive." *Id.* ¶¶ 211–19. Some of these alleged actions include being forced to finish work for the months she missed due to FMLA leave, negative performance reviews for the time she was out on leave, and being prohibited from attending an annual offsite team event. *Id.* In late September 2023, Plaintiff presented these new complaints to HR. *Id.* ¶¶ 220–21. Three days later, in early October, JPMC leadership placed Plaintiff on a performance improvement plan ("PIP"). *Id.* ¶ 223.

In November 2023, Plaintiff retained counsel and notified Defendant of her legal claims of discrimination, harassment, and retaliation. *Id.* ¶¶ 237–38. Plaintiff alleges that JPMC responded by baselessly investigating Plaintiff's corporate card usage and her personal expenditures. *Id.* ¶ 238. The Global Security Department at JPMC determined there was no

wrongdoing by Plaintiff. *Id.* ¶ 240. All of these alleged instances of institutional harassment by JPMC occurred while Plaintiff resided and worked in Georgia.

Prior to Plaintiff's 2023 year-end performance review, she expressed concern regarding the presence of Mr. Lucus and her situational anxiety regarding his harassment of her. *Id.* ¶¶ 241–42. Even so, Mr. Lucus flew to Atlanta for a closed-door meeting with Plaintiff. *Id.* ¶ 242. Plaintiff claims that, during this Atlanta meeting, Mr. Lucus attacked her for her lack of productivity during the months when she was on protected FMLA leave. *Id.* ¶ 245. Plaintiff's bonus was halved, and she was denied stock options for the first time in her tenure, which she argues are further examples of Defendant's retaliation. *Id.* ¶ 246. Plaintiff responded by going on FMLA leave for a third time in February 2024. *Id.* ¶ 251. When Plaintiff took this leave, she lived in Georgia.

When she returned in April 2024, she claims that she was denied a promotion to Southeast U.S. Area Manager, a position that oversees Georgia. *Id.* ¶ 252. Further, she claims that JPMC conducted another baseless HR investigation for a LinkedIn post in which Plaintiff celebrated an industry award secured on JPMC's behalf, containing a photo of the Atlanta leadership team. *Id.* ¶ 255.

In early 2025, JPMC did not issue Plaintiff a raise, nor did they offer her any equity in line with her peers. *Id.* ¶ 272. In late February, Plaintiff was issued a written warning where JPMC cited issues from events in 2024. *Id.* ¶ 275. Plaintiff argues that this warning was pretextual and designed to make her ineligible for key internal recognition and promotions. *Id.* ¶¶ 274, 276–77. After a call with team leadership where Plaintiff complained that her work was being reassigned to Xamayliz Gonzalez, another Atlanta-based employee, Plaintiff made another formal complaint to HR. *Id.* ¶¶ 282–88.

On April 17, 2025, Plaintiff received a call from her managers informing that her employment had been terminated in accordance with the written warning she received. *Id.* ¶ 290.

## II. PROCEDURAL HISTORY

Plaintiff filed this lawsuit on October 8, 2025. Dkt. No. 1. Her Complaint alleges gender/race discrimination, hostile work environment, retaliation, and sexual harassment in violation of 42 U.S.C. § 1981 (Counts One and Two), the Family and Medical Leave Act of 1993 ("FMLA") (Count Three), and Section 94-112 of the Atlanta Human Rights Ordinance ("AHRO") (Counts Four through Six). *Id.* ¶¶ 292–322.

JPMC responded by moving to transfer this action to the Northern District of Georgia, the judicial district that contains Atlanta. Dkt. No. 15. JPMC argues that it has met its burden under 28 U.S.C. § 1404(a) and that transfer would serve the interests of justice.

# DISCUSSION

## I. LEGAL STANDARD ON A MOTION TO TRANSFER VENUE

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The purpose of a motion to transfer venue is to "prevent waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 372 (S.D.N.Y. 2006)..[5] "In considering whether to grant a venue transfer, courts engage in a two-part test: (1) whether the action 'might have been brought' in the proposed transferee forum; and (2) whether the transfer promotes convenience and justice." *Excelsior Designs, Inc. v.*

[5] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

*Sheres*, 291 F. Supp. 2d 181, 185 (E.D.N.Y. 2003) (quoting *Schertenleib v. Traum*, 589 F.2d 1156, 1161 (2d Cir. 1978)). The moving party bears the burden of establishing both prongs, but "[d]istrict courts have broad discretion in making determinations of convenience under Section 1404(a)[,] and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006).

"An action 'might have been brought' in another forum if venue would have been proper there and the defendants would have been amenable to personal jurisdiction in the transferee forum when the action was initiated." *Lihuan Wang v. Phoenix Satellite Television US, Inc.*, No. 13-CV-00218 (PKC), 2014 WL 116220, at *2 (S.D.N.Y. Jan. 13, 2014). JPMC asserts, and Plaintiff does not dispute, that this action could have been brought in the Northern District of Georgia.

The assessment of whether a transfer promotes convenience and justice is made by weighing the following factors:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded to the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*Steck v. Santander Consumer USA Holdings Inc.*, No. 14-CV-06942 (JPO), 2015 WL 3767445, at *2 (S.D.N.Y. June 17, 2015).

## II. JPMC'S MOTION TO TRANSFER VENUE IS GRANTED

### A. The Convenience of the Witnesses Favors Transfer

The convenience of witnesses is the most important factor in the transfer analysis. *Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 27 (S.D.N.Y. 2016). When conducting this analysis, a court "weighs more heavily the convenience of non-party witnesses than party

witnesses." *McGraw-Hill Companies Inc. v. Jones*, No. 12-CV-07085 (AJN), 2014 WL 988607, at *7 (S.D.N.Y. Mar. 12, 2014).

JPMC highlights that almost all relevant witnesses either reside in the Northern District of Georgia or, at a minimum, travel there often for work. Dkt. No. 15 at 11–12. JPMC did not provide an anticipated witness list. But, even absent such a list, a court may analyze a complaint to identify likely witnesses. *Lowinger v. Rocket One Capital, LLC*, No. 23-CV-09243 (JPC), 2024 WL 2882622, at *4 (S.D.N.Y. June 5, 2024). Reviewing the Complaint, the non-party witnesses in this case likely include Samuel Taylor, Kevin Thomas, Mikal Quarles, Robert Hines, Winston Campbell, Vaughn Lucus, Dejuan Palmer, Jay Bailey, Ladonna Murphy, Xamayliz Gonzalez, and Sean Ramasaywak. Of that list, almost all either live in the Atlanta area or travel there often for work. Samuel Taylor and Jay Bailey, the two primary alleged harassers, both reside in Georgia. Dkt. No. 15 at 11. Additionally, Ms. Murphy, Mr. Campbell, Mr. Quarles, and Ms. Gonzalez all reside in Georgia. Compl. ¶¶ 86–87, 150, 156, 282. Other relevant witnesses, named and un-named in the Complaint, including various minority business owners and clients of Plaintiff, fellow employees who also complained of harassment by Mr. Taylor and others, the HR employees who received and investigated Plaintiff's complaints, and potential outcry or character witnesses, also all appear to reside or work primarily in the Atlanta area. Of the potential witnesses not located in Georgia, namely Mr. Hines, Mr. Lucus, Mr. Thomas, and Ms. Young, they are also not located in New York, but most do travel to Georgia often for work. *Id.* ¶¶ 149, 195..[6]

[6] The only identifiable potential witness unequivocally located in New York is Mr. Ramasaywak. Compl. ¶ 33.

Plaintiff argues that the vast majority of the witnesses that reside in Georgia or travel there for work are JPMC employees, *i.e.*, party witnesses, and hence afforded far less deference when analyzing convenience. Dkt. No. 24 at 14–15. True. But *less* deference is not *no* deference. And the Court must still evaluate whether forcing many JPMC employees located in Atlanta to appear in the Southern District of New York is a prudent use of resources by the parties or an efficient way to conduct this litigation. Furthermore, Jay Bailey is a non-party witness residing in Georgia whose testimony will likely be valuable to the trier of fact, and he would be inconvenienced by needing to come to this District for a trial. Plaintiff also argues remote testimony could remedy any inconvenience suffered by the witnesses. Dkt. No. 24 at 15. That may suffice for depositions, but remote testimony for a trial is subject to motion practice and, in the Court's view, is a poor substitute for a jury's opportunity to make credibility determinations through in-person testimony.

In assessing witness convenience, a court must also "qualitatively evaluate the materiality of the testimony" of each of the witnesses. *Herbert Ltd. Partnership v. Electronic Arts Inc.*, 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004). This factor is less important here, where there is little weighing of materiality to do because nearly all the witnesses reside in the Atlanta area. However, to the extent it should be considered, at a minimum the testimony of Messrs. Bailey, Taylor, and Lucus will all be central to Plaintiff's claims of discrimination and retaliation. Therefore, the first factor favors transfer.

**B. The Convenience of the Parties Favors Transfer**

"The convenience of the parties favors transfer when transfer would increase convenience to the moving party without generally increasing the inconvenience to the non-movant." *Liberty Mut. Ins. Co. v. Fairbanks Co.*, 17 F. Supp. 3d 385, 399 (S.D.N.Y. 2014). Transfer would be substantially more convenient for JPMC, saving it the cost of securing

transportation and accommodations, as well as the cost of missed work days, for its many employee-witnesses located outside of New York to come to New York if there was a trial. Transfer also would not unduly inconvenience Plaintiff. Plaintiff currently lives in Alabama, which is unquestionably much closer to the Northern District of Georgia than it is to the Southern District of New York. Dkt. No. 24 at 6. Even factoring in the general ease of transportation to New York City, Atlanta also has a major international airport, is the hub of one of the largest airlines in the country, and is located at the intersection of many major interstate highways. Plaintiff is also no stranger to Atlanta and resided there for years.

Plaintiff chiefly argues that a transfer would inconvenience her because she would have to hire new counsel barred in Georgia. Dkt. No. 24 at 17. It would not. Her retained counsel may appear *pro hac vice* in Georgia. *See Matta v. Roswell Park Cancer Inst. Corp.*, No. 11-CV-00599 (BSJ) (GWG), 2011 WL 3104889, at *6 (S.D.N.Y. July 26, 2011) (noting that when appearing *pro hac vice* is an acceptable alternative, the argument that a plaintiff would be required to retain new counsel if a motion to transfer was granted is not persuasive). Nothing suggests that Plaintiff's current counsel would be ineligible for *pro hac vice* admission in Georgia federal courts.

As transfer would, overall, be more convenient for the parties, the second factor also favors transfer.

**C. The Location of the Evidence Is a Neutral Consideration**

In the digital age, the location of the evidence carries little weight in a transfer analysis with the ready availability of electronic evidence, document sharing, and overnight shipping. *ESPN, Inc. v. Quiksilver, Inc.*, 581 F. Supp. 2d 542, 548 (S.D.N.Y. 2008). Additionally, unless the movant makes a detailed showing of the burden it would incur absent transfer, the location of documents is entitled to little weight. *Royal Ins. Co. of Am. v. Tower Records, Inc.*, No. 02-CV-

02612 (PKL), 2002 WL 31385815, at *6 (S.D.N.Y. Oct. 22, 2002). JPMC argues that the location of key electronic evidence, namely text messages between Plaintiff and Mr. Bailey, are in Georgia because Mr. Bailey resides there, presumably with his cellphone. Dkt. No. 15 at 12. The nature of this evidence would require its disclosure to be in electronic form, which is readily transferable and accessible in either District. While the location of Mr. Bailey outside the 100-mile radius of a document subpoena slightly favors transfer, *see* Fed. R. Civ. P. 45(c)(2)(A), presumably an arrangement could be made for the production at an attorney's office in the Atlanta area, if necessary. Thus, overall, the third factor is neutral.

**D. The Locus of Operative Facts Is Georgia and Supports Transfer**

The locus of operative facts "is a primary factor in determining a . . . motion to transfer." *Rosen v. Ritz-Carlton Hotel Co. LLC*, No. 14-CV-01385 (RJS), 2015 WL 64736, at *4 (S.D.N.Y. Jan. 5, 2015) (quoting *Whitehaus Collection v. Barclay Prods., Ltd.*, No. 11-CV-00217 (LBS), 2011 WL 4036097, at *2 (S.D.N.Y. Aug. 29, 2011)). The "locus of operative facts" is where "acts or omissions for which the Defendant[] could be held liable occurred." *Solar v. Annetts*, 707 F. Supp. 2d 437, 442 (S.D.N.Y. 2010); *see also TouchTunes Music Corp. v. Rowe Int'l Corp.*, 676 F. Supp. 2d 169, 175 (S.D.N.Y. 2009) (defining the "locus of operative facts" as the place where events material to liability occurred and where related actors reside and work).

Here, the events giving rise to Plaintiff's claims occurred almost exclusively in Georgia. This is where she was employed, where she complained of discrimination and retaliation, where she was purportedly denied pay raises and equity interests, where she claims she was retaliated against, where she took FMLA leave in response to the alleged discrimination/retaliation, where she filed complaints with HR, where she was investigated, where her work was reassigned, and where she was ultimately terminated. Compl. ¶¶ 26, 74, 162, 188, 191, 204, 246, 272, 282–88.

Plaintiff, herself, alleges that it was her Atlanta-based connections that made her an attractive hire and such a valuable member of the JPMC team. *Id.* ¶ 22.

Plaintiff argues that since the events giving rise to her claims occurred in numerous districts this factor should be considered neutral. Dkt. No. 24 at 18. But even a cursory reading of the Complaint reveals that the overwhelming majority of the conduct at issue in this lawsuit occurred in Georgia. That a small portion of the acts complained of may have occurred elsewhere, namely Texas, does not change this fact. As a result, this factor heavily favors transfer.

**E. Process to Compel the Attendance of Unwilling Witnesses Is a Neutral Consideration**

For this factor to be given any weight, the parties must demonstrate that their proposed non-party witnesses would be unwilling to testify in the alternate forum. *See Schwartz v. Marriott Hotel Servs., Inc.*, 186 F. Supp. 2d 245, 250 (E.D.N.Y.2002). No party has made this showing. As a result, this factor is neutral. *See Sills v. Ronal Reagan Presidential Found., Inc.*, No. 09-CV-01188 (GEL), 2009 WL 1490852, at *12 (S.D.N.Y. May 27, 2009) (weighing this factor as neutral where a movant failed to indicate a non-party witness would be unwilling to testify)..[7]

**F. The Relative Means of the Parties Is a Neutral Consideration**

"Where disparity exists between the parties, such as an individual plaintiff suing a large corporation, the relative means of the parties may be considered." *Coast to Coast Fabrics, Inc.*

---

[7] To the extent this factor were to be considered as favoring one side or the other, it would also clearly favor transfer, given that nearly all of the potential non-party witnesses live and work in the Atlanta area, as discussed above. If any of these non-party witnesses later became unwilling to travel to testify, they would lie outside of the 100-mile radius for testimonial subpoenas.

*v. Exact Change Only Corp.*, No. 04-CV-07300 (DAB), 2006 WL 846716, at *5 (S.D.N.Y. Mar. 29, 2006) (quoting *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 659 (S.D.N.Y. 1998)).

While JPMC undoubtedly has more means than Plaintiff, her principal argument is unconvincing that transfer would increase her litigation costs due to the need to hire new counsel in Georgia. Her current attorneys may appear in Georgia *pro hac vice*. *Matta*, 2011 WL 3104889, at *6. Furthermore, "the convenience of the parties' lawyers is not relevant to the decision whether to transfer." *Olympia Grp., Inc. v. Cooper Indus., Inc.*, No. 00-CV-07367 (MBM), 2001 WL 506219, at *2 (S.D.N.Y. May 14, 2001). At most, Plaintiff may incur some additional costs due to the need for her present counsel to travel to Georgia for court conferences and trial. But it is unclear how this cost would compare to Plaintiff's own costs to get herself to New York and secure lodging here for trial and any other court conferences she may wish to attend as a party. As a result, this factor is neutral or, at best, very slightly weighing against transfer. *Lopez de Paz v. Experian Info. Sols., Inc.*, No. 25-CV-02180 (JGK), 2025 WL 2710310, at *6 (S.D.N.Y. Sept. 19, 2025) (weighing factor as neutral where non-movant with less means failed to show the proposed transferee forum would be more expensive to litigate in).

**G. The Northern District of Georgia's Familiarity with the AHRO Favors Transfer**

"Familiarity with the governing law as a factor in determining transfer of venue is generally given little weight in federal courts[.]" *Am. Eagle Outfitters, Inc. v. Tala Bros. Corp.*, 457 F. Supp. 2d 474, 479 (S.D.N.Y. 2006). Plaintiff's claims arise under Section 1981, the FMLA, and the AHRO. While both this Court and the Northern District of Georgia are equally familiar with federal law, this Court lacks any familiarity with the AHRO, under which half of Plaintiff's claims arise. Compl. ¶¶ 306–22. In addition to already being familiar with the AHRO, a court sitting in Georgia also has an interest in adjudicating claims turning on that venue's laws. *See Bourdon v. United States Dep't of Homeland Sec.*, 235 F. Supp. 3d 298, 308

(D.D.C. 2017). Although this factor is to be accorded relatively little weight, it clearly favors transfer.

**H. Plaintiff's Choice of Forum Is a Neutral Consideration**

"A plaintiff's choice of forum is generally entitled to considerable weight and should not be disturbed unless the balance of the factors is strongly in favor of the defendant." *Guardian Life Ins. Co. of Am. v. Coe*, 724 F. Supp. 3d 206, 214 (S.D.N.Y. 2024). However, a plaintiff's choice receives less weight when she does not reside in the forum and the lawsuit has little or no connection to the forum. *Lopez de Paz*, 2025 WL 2710310, at *6; *Morgan Guar. Tr. Co. of New York v. Tisdale,* No. 95-CV-08023 (BSJ), 1996 WL 544240, at *8 (S.D.N.Y. Sept. 25, 1996). Where a lawsuit has no connection to the forum and Plaintiff seemingly only chose it for tactical advantages, such as exposing a defendant to more cost, the plaintiff's choice is accorded no deference at all. *See id.*; *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001).

Plaintiff does not reside, nor has she ever resided, in this District. None of the actions or events giving rise to this lawsuit emanated from this District. And there is no obvious reason why Plaintiff wishes to pursue her claims in this District, other than the location of her counsel, which is not relevant. Accordingly, Plaintiff's decision to file suit in the Southern District of New York only marginally weighs against transfer, if at all.

Plaintiff proffers three points in opposition. First, Mr. Ramasaywak, one of Plaintiff's direct supervisors, worked in New York. Compl. ¶ 33. Second, JPMC is headquartered in this District. *Id.* ¶ 10. Third and last, Plaintiff conducted a variety of activities in this District during her employment, such as her work with Cheddar News Network. Dkt. No. 24 at 7. Virtually none of these facts are related, however, to the alleged harassment and retaliation giving rise to Plaintiff's claims. Plaintiff worked in the Northern District of Georgia, most of the alleged harassment and retaliation occurred in that district, and the two main alleged harassers work and

live in that district. Plaintiff also resided in Georgia during all of the relevant events and at the time she filed this lawsuit; she apparently moved to Alabama at some point between filing the action and opposing JPMC's motion to transfer. *Compare* Compl. ¶ 13 ("Plaintiff Rashida Winfrey is a citizen of Georgia"), *with* Dkt. No. 24 at 11 (reporting Plaintiff moved to Alabama after commencing this action). Furthermore, the Complaint is full of different individuals who worked with Plaintiff and who were involved with or have relevant information about the events alleged; that *one* of them resides in this District is insufficient. *See Elec. Workers Pension Fund v. Nuvelo, Inc.*, No. 07-CV-00975 (HB), 2007 WL 2068107, at *4 (S.D.N.Y. July 19, 2007) (noting it was insufficient that "some tangentially related witnesses may reside in or near New York"). Moreover, JPMC's headquarters is of no moment, because it is the party seeking transfer, and in any event, it is JPMC's business location in Atlanta that is the locus of the events of this case, not its corporate headquarters in New York. None of these factors are sufficient to lend weight to Plaintiff's choice of forum.

**I. Court Efficiency and the Interests of Justice Favor Transfer**

"The Court's consideration of whether transfer is in the interest of justice is based on the totality of the circumstances and relates primarily to issues of judicial economy." *Indian Harbor Ins. Co. v. Factory Mut. Ins. Co.*, 419 F. Supp. 2d 395, 407 (S.D.N.Y. 2005). Two major considerations related to judicial economy include: (1) the timeliness of when the trial could be conducted; and (2) whether transfer would facilitate discovery. *Tianhai Lace USA, Inc. v. Forever 21, Inc.*, No. 16-CV-5950 (AJN), 2017 WL 4712632, at *7 (S.D.N.Y. Sept. 27, 2017).

The timeliness of when trial could be conducted is neutral because this District has a median 36.4-month filing-to-trial window, while the Northern District of Georgia has a 36.1-month window. U.S. Courts, *Federal Court Management Statistics, December 2025* (Dec. 31, 2025), https://www.uscourts.gov/data-news/reports/statistical-reports/federal-court-management-

statistics/federal-court-management-statistics-december-2025/;.[8] *Seltzer v. Omni Hotels*, No. 09-CV-09115 (BSJ) (JCF), 2010 WL 3910597, at *6 (S.D.N.Y. Sept. 30, 2010).

Nevertheless, transfer would facilitate efficient discovery. "Transfer of an action facilitates discovery when: (1) the action is in the early stages of litigation; and (2) the transferee district is the place where the operative events occurred and where many witnesses and documents are located." *Wechsler v. Macke Int'l Trade Inc.*, No. 99CV-05725 (AGS), 1999 WL 1261251, at *10 (S.D.N.Y. Dec. 27, 1999). Discovery has not yet begun in this action. Further, as discussed above, the transferee district is the locus of operative facts and is more convenient for the witnesses that have been identified. Additionally, "[t]he public interest in local adjudication of local controversies also favors transfer to the states where the events underlying the litigation occurred." *Lopez de Paz*, 2025 WL 2710310, at *9. Finally, a judge sitting in the Northern District of Georgia will already be familiar with the AHRO. In totality, this factor also weighs in favor of transfer.

### J. Balancing the Factors

In sum, five of the relevant factors heavily favor transfer. The remaining four are either neutral or marginally weigh against transfer. Most notably, the factors that courts consistently give the most weight to—the convenience of the witnesses and locus of operative facts—are both decidedly in favor of transfer. Accordingly, JPMC has met its burden under 28 U.S.C. § 1404(a) to show that transfer is in the "best interests" of the litigation.

---

[8] There are, however, roughly three times as many pending cases in this District as in the Northern District of Georgia. *See City of Pontiac Gen. Employees' Ret. Sys. v. Stryker Corp.*, No. 10-CV-00376, 2010 WL 2035130, at *5 (S.D.N.Y. May 21, 2010) (reviewing case statistics in assessing whether to transfer a case).

## CONCLUSION

For all of the forgoing reasons, JPMC's motion to transfer venue to the Northern District of Georgia (Dkt. No. 14) is GRANTED. The Clerk of Court is respectfully directed to transfer this case to the Northern District of Georgia under 28 U.S.C. § 1404.

Dated: September 14, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge